Filed 11/14/13  In re Jasmine C.CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re JASMINE C., A Person Coming Under the Juvenile Court Law. | B247783 (Los Angeles County Super. Ct. No. CK60354) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. PEDRO C. et al., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Elizabeth Kim, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Amy Z. Tobin, under appointment by the Court of Appeal, for the minor and Appellant.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant Pedro C.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and William D. Thetford, Deputy County Counsel for Plaintiff and Respondent.

# I.  INTRODUCTION

The father, Pedro C., and the child, Jasmine C., appeal from the juvenile court's February 13, 2013 jurisdiction and disposition orders.  They challenge the juvenile court's jurisdictional findings under Welfare and Institutions Code section 300, subdivisions (d) and (j).[1]  The juvenile court found the child was at substantial risk of harm based on the father's prolong sexual abuse of Michelle V.  Michelle is the child's half-sister.  In addition, the father and the child object to the disposition order removing Jasmine from the father's custody.  We affirm the jurisdiction and disposition orders.

# II.  PROCEDURAL HISTORY

On January 3, 2013, the Los Angeles County Department of Children and Family Services (department) filed a section 300 petition on behalf of the child, age 10.  The petition was filed pursuant to section 300, subdivisions (b), (d) and (j).  The petition alleged the father sexually abused Michelle since she was nine years old.  Michelle is the child's half-sibling.  The father repeatedly fondled Michelle's breasts, vagina and buttocks.  At the January 9, 2013 detention hearing, the child was detained and removed from the father's custody.

The department also filed a supplemental petition on behalf of 17-year-old Michelle on December 31, 2012.  The section 387 petition alleged the father, Michelle's legal guardian, sexually abused her.  On January 16, 2013, the father filed a section 388 petition requesting termination of his legal guardianship over Michelle.

The juvenile court held a combined hearing on the sections 300, 387 and 388 petitions over the course of seven days.  During the hearing, the juvenile court admitted into evidence five department reports.  In addition, the juvenile court heard testimony from:  the father; Michelle; the father's adult daughter Dalila; children's social worker

---

[1]  All further references are to the Welfare and Institutions Code unless otherwise indicated.

Elizabeth Castellano; and the child. The juvenile court granted, in part, the child's section 350, subdivision (c) motion by striking the b(1) allegation from the section 300 petition. The juvenile court sustained the section 387 petition and found Michelle was a dependent of the court under section 300, subdivision (b). The juvenile court also granted the father's section 388 petition, terminating his legal guardianship over Michelle. In addition, the juvenile court sustained counts d(1) and j(1) in the section 300 petition. The juvenile court declared the child a dependent of the court under section 300, subdivisions (d) and (j) and removed her from the father's custody. The department was ordered to provide the father with family reunification services. The father was ordered to attend sex abuse counseling for perpetrators and individual counseling to address case issues. The father was granted monitored visits with the child in a neutral location. The father filed his notice of appeal on February 25, 2013. The child filed her notice of appeal on April 15, 2013.

## III. EVIDENCE

### A. Detention Report

The January 3, 2013 detention report was prepared by a children's social worker, Ms. Castellano. The report indicated Michelle and the child were removed from the mother, Ana Z., in 2005. The sustained petition stated: the mother had mental and emotional problems including delusions, paranoia and hallucinations; the mother failed to take her prescribed psychotropic drugs on a consistent basis rendering her unable to provide appropriate care and supervision of the children; in April 2007, the child was returned to the father; in November 2007, the juvenile court terminated jurisdiction over the child; and in January 2008, the father became Michelle's legal guardian.

On December 14, 2012, the father and the child left home to visit Mexico. Michelle remained behind in the care of the father's adult daughter, Dalila. On December 25, 2012, Michelle revealed the sexual abuse to Joseph F. and his fiancé,

3

Jackee C. Joseph and Michelle are cousins. Jackee encouraged Michelle to report the abuse to the department.

The next day, Michelle went to the department's regional office and spoke with a children's social worker, John Casey. Michelle told Mr. Casey that the father has been inappropriately touching her buttocks, vagina, and breasts under and over her clothes since she was 9 years old. Michelle stated the father came into her bedroom. The child and Michelle shared the same bedroom. Michelle slept on the bottom and the child slept on the top bunk bed. Michelle reported the father laid on the floor next to the bunk bed and touched her when he thought she was asleep.

### B. Jurisdiction and Disposition Report

Ms. Castellano prepared the January 22, 2013 jurisdiction and disposition report. Ms. Castellano interviewed Michelle on December 28, 2013. During the interview, Michelle stated the father had inappropriately touched her since she was 9 years old. The last incident took place on December 12, 2012. Michelle stated it only involved touching. Michelle was asked why she had never told someone else about the sexual abuse. Michelle replied she never said anything before because she was afraid. Michelle's fears arose from what might happen to the child.

Ms. Castellano interviewed the mother on December 27, 2012. The mother was unaware of any sexual abuse by the father. The mother stated Michelle was old enough to have said something if there was abuse.

Ms. Castellano interviewed the father on January 11, 2013. The father denied the allegations, stating he was shocked and distraught. The father stated he had never gone to Michelle's bedroom in the middle of the night and never touched her in an inappropriate way. He stated he treated Michelle as his own daughter and did not understand why she would say those things about him. The father indicated Michelle might be mad at him. This was because he bought the child clothes before he went to

Mexico. He told Michelle he would buy her clothes and all her school needs after he returned.

Ms. Castellano interviewed the child on January 16, 2013. The child stated she never saw the father go into their bedroom at night. But the father did come into the room one time when it was still dark to wake Michelle up so she could go work at a polling place. The child denied the father ever touched her in any inappropriate way. The child stated the father had talked to her about not letting anyone touch her inappropriately and told her to tell him if anyone ever tried. The child stated Michelle's relationship with the father was good. The child reported Michelle was calm around the father. But Michelle became mad when she was punished or did not receive money from the father. The child did not notice Michelle acting afraid or uncomfortable around the father. Ms. Castellanos wrote: "[The child] stated that Michelle sometimes made her steal [the father's] rent money. She stated that she would give Michelle the money and she would buy little round packs of balloons. She stated that Michelle would always hang out with the gangster girl that lived in the back house and would get mad when [the father] would tell her to come back in the house because it was late."

Ms. Castellano also interviewed Morelia C., the father's adult daughter. Ms. Castellano described how Morelia met Michelle, "Morelia stated that she has known Michelle since she was very little when [the] father began seeing Michelle's mother [, A.Z.]" Morelia said the father and Michelle had a good relationship. The father provide for Michelle as if she were one of his daughters. Morelia stated the father was on top of Michelle's schooling, health and well-being. Morelia did not observe Michelle to be afraid or uncomfortable around the father. Morelia did not see the father do anything inappropriate to Michelle. The father was very strict and Michelle did not following the rules. Michelle could become very upset with the father for disciplining her. But the father did not talk ill of Michelle even when she misbehaved.

Ms. Castellano wrote she had been providing services for the family since 2006. During her monthly contact with the family, she had never observed any inappropriate behavior by the father. To the contrary, the father had been cooperative, always made

himself available when needed and was on top of Michelle's and the child's medical and academic progress. Ms. Castellano did not observe any signs of sexual abuse. Also, Michelle did not appear afraid or uncomfortable in the father's presence. But Ms. Castellano recommended termination of the father's legal guardianship of Michelle. This was because the father no longer wanted to be Michelle's legal guardian.

Ms. Castellano assessed there was "potential risk" but recommended the child be returned to the father's custody. Ms. Castellano observed the child to be a happy, active and well adjusted youngster. Ms. Castellano wrote: "[The child] has always been close to her father and is unhappy to be apart from him. Father has always cared for the [child] and [there] have been no concerns or safety issues while under his care. Therefore, it is respectfully recommended that [the child] [be] return[e]d to father's . . . care and implement Family Maintenance Services to monitor the family and provide them with services such as counseling."

### C. Interim Review Report

On January 28, 2013, the department filed an interim review report pursuant to the juvenile court's January 23, 2013 order. Ms. Castellano interviewed Michelle a second time on January 24, 2013. This time, Michelle provided a different version of the father's misconduct. Michelle stated the sexual abuse started when she was nine years old. She was wearing red shorts and lying on the floor watching television in the living room. The mother was already asleep. The father came and laid next to Michelle. He touched Michelle's thighs and put his hand under her panties. The father inappropriately touched Michelle on five separate occasions. On the sixth time, the father took off Michelle's shorts and had sex with her in the living room. Michelle stated she closed her eyes and blacked out. The next morning, the father told Michelle she should not tell anyone what he had done or he would go to jail. Michelle did not tell anyone about the incident because she thought people would think she was crazy. Sometime in 2012, Michelle told

6

an unidentified "best friend" about the father's misconduct.  In November 2012, Michelle spoke to the father.  The father responded, "[G]o ahead tell her, I dare you."

Michelle reported the sexual abuse happened daily afterwards.  The abuse took place in Michelle's bedroom during the day after school around 6:00 p.m. or at night around 10 p.m. when everyone was asleep.  The child was outside during the daytime and sleeping at night when the abuse happened.  If the abuse happened during daytime, the father locked the bedroom door.  Sometimes the child or the mother asked where Michelle was.  The father told the mother and the child Michelle was changing and would be right out.  At night, the father would come into bed and have sex with Michelle while the child slept on the top bunk bed.  Sometimes, the father would have sex with Michelle when she slept on the top bunk.  Michelle initially stated the father did not use a condom.  But later, she stated the father would sometimes use a condom after she had a boyfriend.  Sometimes, Michelle would tell him to stop and try to push him off.  At times, she had tears in her eyes.  Michelle stated the father was drunk two or three times during the abuse.

Michelle decided to report the sexual abuse after a conversation with a neighbor.  She stated:  "In December 2012, before [the father] went to Mexico [,] my neighbor said that [the father] looked like a child molester.  When he said that I told him part of what was going on but I didn't tell him everything.  His girlfriend told me that I shouldn't be living like that and I should say something."  Michelle did not tell anyone all these years because she was scared of what would happen to her and the child.

When asked why her story changed, Michelle responded:  "I changed my mind [because] when we were in court I heard that [the child] might be going back home with him and I don't want her to go back with him.  I decided that I should say everything [because] someone was telling me that if he did this to me what makes me think he won't do it to her.  I'm not saying this because I wanted to get out of the house."  Michelle did not see the father do anything inappropriate with the child.  Michelle added:  "But I don't want her to go back with him.  I know his daughters are on his side but that's because they don't know how he really is."

7

As noted, Ms. Castellano had been providing unspecified family services for several years. And during that time period, Michelle never mentioned any sexual misconduct by the father. According to Ms. Castellano, Michelle responded: "I don't know. I was scared of what was going to happen to me and my sister." Michelle was asked why she had changed her version of what had occurred. As noted, Michelle had previously only reported that fondling had occurred. Michelle responded: "I changed my mind [because] when we were in court I heard that [the child] might be going back home with him and I don't want her to go back with him. I decided that I should say everything [because] someone was telling me that if he did this to me what makes me think he wouldn't do it to her." Ms. Castellano asked: "When we talked about possibly placing you in transitional housing placement where you would be living independently, you stated that you wanted to do that but then shortly after you said you had changed your mind and wanted to stay with [the father]. Why did you change your mind?" Michelle replied, "I don't know."

Ms. Castellano observed during the interview, Michelle was calm and cooperative, answering every question. Ms. Castellano recommended the child be suitably placed with family reunification services provided to the father. Ms. Castellano wrote, "[The child] wishes to return to father's care however, due to the allegations of [the father's] sexual inappropriate behavior towards Michelle, it is felt that [the child] may be at risk at this time."

### D. Father's Testimony

The father testified the family had lived at the current residence for about six years. Michelle and the child shared a bedroom. Michelle slept on the lower bunk and the child slept on the upper bunk bed. The father only went into the girls' bedroom at night once to wake Michelle up to work at the polls. During the day, he only went into the bedroom to help clean or make repairs. He was never alone in the bedroom with Michelle. The father denied inappropriately touching or sexually abusing Michelle.

The father had six adult daughters:  Morelia, age 27; Maribel, age 26; Dalila, age 25, Esperanza, age 24; Violeta, age 21;  and Viridiana, age 20.  The daughters lived with the father until he separated from their mother.  They visited him often after the divorce.  The father has never been accused of sexually abusing any of his adult daughters.

## E.  Michelle's Testimony

Michelle testified she lived with the father when she was seven years old.  She stated the father first touched her inappropriately when she was nine years old while she was in the living room.  Michelle was placed in foster care when she was nine and a half.  She later was placed with the father when she was 12 years old.  Michelle testified the abuse resumed after she returned from foster care.  When she became pregnant, she did not know if it was the father or her boyfriend's child.  Michelle testified the child, the mother, and Dalila knew the father slept in her room.

Michelle stated she went back to the father because she did not want to be in the foster home.  She stated they "were starving to death" at the foster home and would eat candy almost every day because they went to parties.  Michelle admitted lying to the social worker that everything was going great before reporting the abuse in December 2012.  At one point while testifying, Michelle was asked in reference to the father's molestation, "[W]hy didn't you tell all that to Ms. Castellanos in the very beginning?"  Michelle testified:  "Because I know that people were going to be like, . . . why didn't you say this in the first -- all these years you never said anything.  Why now?" Michelle changed her mind about going to transitional housing when it was offered because she was scared she would not know how to manage for herself.  Michelle did not tell the social worker, Ms. Castellano, everything during the first interview.  This was because she was afraid the father's adult daughters would be against her.  Michelle also was concerned the child would be placed in foster home.  At another point while testifying, Michelle was asked why she initially only described the father as fondling her.  As noted, Michelle only described fondling related conduct during the first interview where the

father's sexual misconduct was discussed with Ms. Castellanos. Michelle testified, "Because my sister was going to go back with him." Under those circumstances, Michelle believed that the child was in some danger.

Michelle never saw the father do anything inappropriate with the child. While testifying, Michelle expressed fear for the child's safety. When asked why she had such a concern, Michelle testified: "Because if he did that to me, then why won't he do it to her. I mean, that's his daughter, but still that's the age he started. You know, you never know."

F. Dalila's Testimony

Dalila is one of the father's adult daughters. In the preceding four years, Dalila and her 4-year-old son, Jason, had lived with the father, Michelle and the child. Dalila had a good relationship with the father. Dalila testified the father was very involved in her life, except for a two-year period. The two-year period occurred after the father separated from Dalila's mother.

Dalila never saw the father go into Michelle's bedroom to sleep. Dalila would see the father sleeping in the dining room when she went to the kitchen to get her baby his bottle. Dalila testified the black metal bunk bed in the bedroom where the child and Michelle slept made noise when you sat down on the bottom bunk or climbed the ladder.

Dalila testified the father never molested her. She did not observe the father being inappropriate with her sisters. And, her sisters never told her that the father molested them. The child never told Dalila that she did not feel safe around the father or that he was being inappropriate with her. Michelle also never said that the father was being inappropriate with her. At one point, Dalila was asked, "[W]as there any time that you saw anything in your home that indicated that your father and Michelle were having an inappropriate relationship?" Dalila responded, "No."

10

## G. Social Worker's Testimony

Ms. Castellano has been a social worker for six and a half years. She has been Michelle's social worker for six years. They first met when Michelle was 11 years old. Ms. Castellano saw Michelle once a month, sometimes more. Michelle first stated the father fondled her, there was no mention of intercourse. Ms. Castellano wrote the jurisdiction and disposition report based on the first interview with Michelle. Ms. Castellano initially recommended the child be returned to the father's custody. Ms. Castellano explained her recommendation in the January 22, 2013 jurisdiction and disposition report thusly: "When I spoke to Michelle, she had told me that she didn't think that [the father] had done anything to [the child]. She did not feel that she was at risk at that time."

Ms. Castellano interviewed Michelle again pursuant to a court order. After the second interview, Ms. Castellano recommended the child be removed from the home. Ms. Castellano observed Michelle was " a lot more open" and provided greater details. Ms. Castellano added, "And I felt because of that, [the child] being so young, around the same age where the abuse started with Michelle, that possibly she might be at risk."

## H. The Child's Testimony

The child testified she slept in the top bunk bed. Michelle slept on the bottom bunk bed. No one else slept in their bedroom. The father slept on the living room floor. The mother slept on a bed in the living room. At times, the child would get up in the middle of the night to use the bathroom. She never saw the father sleeping in her bedroom. The child heard a squeaking sound when Michelle got in and out of the bottom bunk bed. But, the child did not recall being awakened by the squeaking when Michelle got out of the bed. The child did not feel uncomfortable around the father. Also, she testified the father never touched her in a place she did not think was right.

11

## IV.  DISCUSSION

### A.  Standard Of Review

We review the juvenile court's jurisdictional findings for substantial evidence.  (*In re E.B.* (2010) 184 Cal.App.4th 568, 574-575; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.)  We review a removal order for substantial evidence in the light most favorable to the juvenile court's order to determine whether sufficient evidence supports the court's findings by clear and convincing evidence.  (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969; *In re Mariah T.* (2008) 159 Cal.App.4th 428, 441.)   Substantial evidence is relevant evidence which adequately supports a conclusion; it is evidence which is reasonable in nature, credible and of solid value.  (*In re E.B., supra,* 184 Cal.App.4th at p. 575; *In re J.K., supra,* 174 Cal.App.4th at p. 1433.)  We draw all reasonable inferences from the evidence to support the juvenile court's findings and orders.  We adhere to the principle that issues of fact, weight and credibility are the provinces of the juvenile court.  (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)  We do not reweigh the evidence.  (*In re I.J., supra,* 56 Cal.4th at p. 773; *In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

### B.  Jurisdictional Findings

Section 355, subdivision (a) provides:  "At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300.  Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence.  Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300 . . . . "  Section 300, subdivision (d) states:  "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a

12

dependent child of the court: . . . [¶] (d) The child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent . . . or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew that the child was in danger of sexual abuse. . . ."

Section 300, subdivision (j) sets forth the applicable ground for juvenile court jurisdiction, "The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." Section 300, subdivision (j) contains a list of factors for the trial court to consider, "The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

Our Supreme Court explained: "[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here require only a "substantial risk" that the child will be abused or neglected. The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm.*' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J., supra,* 56 Cal.4th at p. 773; see *In re R.V.* (2012) 208 Cal. App.4th 837, 843.)

The father and the child challenge the juvenile court's jurisdictional findings under section 300, subdivisions (d) and (j). They argue there is insufficient evidence to support the jurisdiction findings. They reason as follows. The child denied any sexual abuse or inappropriate touching by the father. The child also never observed any inappropriate

13

behavior by the father towards Michelle. They contend, unlike Michelle, the child is the father's biological daughter. Because none of the father's six biological adult daughters were ever abused by the father, the child is not at substantial risk for sexual abuse by him. In addition, they assert Ms. Castellano, the social worker, who visited the family monthly for six years observed no sexual abuse and did not have any concerns. Given the standard of review, these contentions are meritless.

Substantial evidence supports jurisdiction under section 300, subdivisions (d) and (j). Michelle testified she was abused repeatedly by the father. No doubt, Michelle was not the father's biological daughter. But the father stated he treated Michelle like a daughter. The father lived with Michelle beginning when she was seven and later became her legal guardian when she was 12. Moreover, we have expressly rejected, for purposes of review on appeal, the fanciful theory that a child is not at risk because only a half-sibling was molested. (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 968, 970 (*Los Angeles County*) ["The juvenile court's distinction between a stepdaughter and a biological daughter is contrary to the holdings and language of the cases that suggest sexual abuse of one child in the household puts at risk other children in the household"].) The sexual abuse of one child may constitute substantial evidence of risk to another child in the household—even to a sibling of a different sex, age, or a half-sibling. (*Id*. at p. 968 [father's sexual abuse of stepdaughter placed his younger daughter at substantial risk of abuse].) As we explained: "[A]berrant sexual behavior directed at one child in the household places other children in the household at risk, and this is especially so when both children are females." (*In re I.J., supra,* 56 Cal.4th at p. 774; *Los Angeles County, supra,* 215 Cal.App.4th at p. 970; *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1332.)

Because of the father's severe sexual abuse of Michelle, even a low probability of abuse warranted the juvenile court assuming protective jurisdiction over the child. Our Supreme Court explained: "[T]he more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively

14

minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*In re I.J., supra,* 56 Cal.4th at p. 778.) Also, there is substantial evidence the sexual abuse occurred in Michelle's and the child's bedroom. There is testimony this occurred while the child was asleep in the top bunk bed. The child could have witnessed the aberrant sexual behavior, a jurisdictional factor under section 300, subdivision (j). Our Supreme Court has stated, "Also relevant to the totality of the circumstances surrounding the sibling abuse is the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse." (*In re I.J., supra,* 56 Cal.4th at p. 778; *In re Ana C., supra,* 204 Cal.App.4th at p. 1332.)

## C. Removal Order

Section 361, subdivision (c)(1) provides: "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . . The court shall also consider, as a reasonable means to protect the minor, allowing a nonoffending parent or guardian to retain physical custody so long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." Section 361, subdivision (d) states: "The court shall make a determination as to whether reasonable efforts were made to prevent or eliminate the need for removal of the minor from his or her home . . . . The court shall state the facts on which the decision to remove the minor is based."

The purpose of section 361 is to avert harm to the child. The parent need not be dangerous nor the child actually harmed before removal is appropriate. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917; *In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) The juvenile court may consider both the parent's past conduct and the present circumstances. (*In re Cole C., supra,* 174 Cal.App.4th at p. 917; *In re S.O.* (2002) 103 Cal.App.4th 453, 461.)

All of our findings analyses concerning the jurisdictional and disposition proceedings apply with equal force to the removal order. The father and the child argue the removal order was not supported by substantial evidence. They argue: the child was never neglected or abused by the father; the father never molested his six adult daughters; there was no evidence the father had any substance abuse, domestic violence, mental health, or any other social issues; in the six years the social worker, Ms. Castellano, visited the family, she did not have concerns about the father; and Ms. Castellano only stated the child might possibly be at risk, which is insufficient to support the removal order. In addition, they argue there was an alternative to removal. The social worker could have made unannounced visits to insure the child's safety. Also, the child was an articulate 10 year old who was capable of reporting sexual abuse. When the applicable standard of review is applied, these arguments are meritless.

Substantial evidence supports the removal order. Ms. Castellano, the social worker, initially recommended the child remain with her father. But Ms. Castellano changed the recommendation after re-interviewing Michelle. Ms. Castellano observed Michelle was "a lot more open" and provided greater details about the molestation. Ms. Castellano believed the child was at risk. The child was young and around the same age as Michelle when the molestation commenced.

Additional evidence supports removal based on the substantial danger to the child's safety and well-being because of the father's prolonged sexual abuse of Michelle. The father sexually abused Michelle beginning when she was nine. The abuse continued when Michelle returned from foster care at age 12 and continued until she reported the

16

abuse when she was 17. The argument that the juvenile court merely should have ordered unannounced visits as an alternative to removal is meritless. The father sexually abused Michelle even while she was a party to an open juvenile court case. Ms. Castellano visited the family monthly but was unaware of the father's aberrant sexual behavior. Equally unmeritorious is the father's and child's speculative contention that removal was unwarranted because if sexual abuse did occur, she would report it. The purpose of section 361 is to avert harm to the child. The parent need not be dangerous nor the child actually harmed before removal is appropriate. (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-136; *In re Cole C., supra,* 174 Cal.App.4th at p. 917.)

## V.  DISPOSITION

The jurisdiction and disposition orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.

KUMAR, J.[*]

---

[*]  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.